UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| Metropolitan Life Insurance Company, | ) |  |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 05 C 3509 |
| | ) | Judge Virginia M. Kendall |
| Gwendolyn D. Robinson, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Metropolitan Life Insurance ("MetLife" or "Plaintiff") brought this action against Defendant Gwendolyn Robinson ("Robinson" or "Defendant") seeking rescission of a disability insurance policy and to recover money paid under that policy claiming that Robinson fraudulently misrepresented her medical history when she applied for the policy. Now before the Court is MetLife's Motion for Summary Judgment. The Court finds that a genuine issue of material fact remains for trial as to whether the misrepresentations in Robinson's application for insurance are attributable to a MetLife agent. Accordingly, MetLife's Motion for Summary Judgment is denied.

**STATEMENT OF FACTS**

At some point in 1996, Robinson was referred to MetLife agent Eugene Moore ("Moore") in connection with her efforts to obtain disability insurance. (Def.'s 56.1(b)(3)(C) ¶ 3; Pltf.'s 56.1 ¶ 6.)[1] Moore was – and today remains – an employee of MetLife; he has sold MetLife insurance

---

[1] The facts are presented in the parties' statements pursuant to Local Rule 56.1. Plaintiff's Statement of Undisputed Material Facts is cited as "Pltf.'s 56.1 ¶ __"; Defendant's Response is cited as "Def.'s Response ¶ __"; Defendant's Statement of Additional Facts is cited as "Def.'s 56.1(b)(3)(C) ¶ __"; and Plaintiff's Response is cited as "Pltf.'s Response ¶ __". Additionally, the Exhibits filed with the parties' summary

1

policies since 1965. (Def.'s 56.1(b)(3)(C) ¶ 1). After meeting with Moore, Robinson signed an application for disability insurance coverage (the "Application") on June 7, 1996. MetLife issued Robinson disability insurance policy number 6 350 845 AH (the "Policy") with an effective date of July 10, 1996.

The Application sets forth answers to a number of questions seeking information related to Robinson's medical history. (Pltf.'s Exh. C). The answers set forth in the Application do not indicate that Robinson suffers from any health problems. For example, one question on the Application seeks information from the applicant regarding all instances of examination by a physician or health facility in the last five years. *Id.* at p.8, question 3. The response on the Application states the name of only one physician, Conrad May, M.D., indicates a date of 1995, and, under the heading "Symptoms or Ailments, or Other Reasons for Consultation, Diagnosis," states only, "check up - in good health." *Id.* The Application does not contain any response to a question seeking the name and address of Robinson's personal physician, practitioner, counselor, chiropractor, or health facility. *Id.* at p.8, question 5. The Application also reflects a response of "no" to the questions: (1) "[h]ave you EVER received treatment, attention, or advice from any physician . . .for . . . or been told by any physician . . . that you had . . . chest pain?"; (2) "[h]ave you EVER received treatment, attention, or advice from any physician . . . for . . . or been told by any physician . . . that you had [a]rthritis, disorder or deformity of the bones, muscles or joints . . . ?"; and (3) "[h]ave you EVER: . . . gone to a hospital [or] clinic . . . for observation, examination or treatment not revealed in previous questions?" *Id.* at p.8, question 6 and p.9, question 7. The following statements appear

---

judgment briefs are cited herein as "Def.'s Exh. __" and "Pltf.'s Exh. __."

immediately above Robinson's signature on the Application:

> I have read this application and agree that all statements and answers are true and complete to the best of my knowledge and belief. It is also agreed that:
> 1. The statements and answers in this application are the basis of any policy issued.
> 2. No information will be considered to have been given to [MetLife] unless it is stated in the application.

*Id.* at p.10.

On August 21, 1996, Robinson signed and thereafter submitted to MetLife an amendment to the Application (the "Amendment"). (Pltf.'s 56.1 ¶ 6.) The Amendment states "I have had full recovery with no residuals from 06/96 cold, Dr. May." *Id.* at ¶ 10. Immediately above Robinson's signature, the Amendment further states, "To the best of my knowledge and belief, the statements and answers in the application as amended by this form are true and complete as of the date this form is signed. There are no facts or circumstances which would require a change in the answers in the application, except as shown above." *Id.* at ¶ 11.

The information contained in the Application does not accurately describe Robinson's medical history prior to June 7, 1996. In January 1994, Robinson was admitted to MacNeal Hospital complaining of a one-week history of severe headaches, dizziness, numbness and lower extremity weakness. *Id.* at ¶ 13. At that time, Robinson was examined and treated by Daniel Hirsen, M.D. ("Dr. Hirsen"), a physician specializing in rheumatology. *Id.* at ¶ 12, 13.

Dr. Hirsen also examined and/or treated Robinson on each of the following dates: February 15, 1994; May 15, 1994; July 14, 1994; July 26, 1994; August 23, 1994; August 31, 1995; and September 21, 1995. *Id.* at 14. Dr. Hirsen's notes reflect that on February 15, 1994, Robinson complained of occipital headaches, generalized stiffness and joint pain in her legs and left arm. *Id.* at 15. Dr. Hirsen's working diagnosis on February 15, 1994 was "a lupus-like illness." (Pltf.'s Exh.

3

E at MLCL 00221.) Dr. Hirsen's notes reflect that on May 15, 1994, Robinson reported having increased occipital headaches in the preceding five to six days and that Robinson had resumed taking Prednisone. *Id.* at ¶ 16 (citing Pltf.'s Exh. E at MLCL 00219-00220). On July 14, 1994, Dr. Hirsen increased Robinson's dosage of Prednisone, noting that Robinson had reported experiencing recurrent severe headaches, anterior rib pain, and hand and wrist pain during the preceding two weeks. *Id.* at ¶ 17. Dr. Hirsen also noted that Robinson reported that her headaches had made it very difficult for her to function. *Id.* On July 26, 1994, Dr. Hirsen noted that Robinson had reported that her symptoms had led her to cut her work schedule to only two to three hours daily and he again increased her Prednisone dosage. *Id.* at ¶ 18. On August 23, 1994, Dr. Hirsen noted that Robinson complained primarily of knee and ankle pain and that she had begun working some full days as opposed to two to three hours per day as had been the case in July of 1994. *Id.* at ¶ 19. Dr. Hirsen prescribed Plaquenil and noted that Robinson would continue taking Naprosyn and Prednisone. *Id.*

Approximately one year later, on August 31, 1995, Dr. Hirsen noted that Robinson had reported experiencing generalized joint pain, tiredness and anterior pleuritic chest pain during the preceding three weeks. *Id.* at 20. On September 21, 1995, Dr. Hirsen noted that Robinson's condition had improved but that she continued to complain of pleuritic chest pain, joint pain and occasional headaches. *Id.* at 21.

Robinson was examined and/or treated by John Skosey, M.D. ("Dr. Skosey") on July 13, 2000. *Id.* at 25. On that day, Dr. Skosey drafted a letter to Robinson's treating internist, Steve Michel, M.D., describing Robinson as a patient with a history of systemic lupus erythematosus of an eight-year duration. *Id.* Similarly, hospital records from August of 2003 describe Robinson as a patient with a twelve-year history of lupus. *Id.* at 28.

4

While the contents of the Application and various medical records describing Robinson's medical history are not the subject of genuine dispute, the parties are at odds with respect to the process by which the Application was completed. Robinson asserts that Moore and his secretary were responsible for completing that portion of the Application relating to her medical history – questions 3, 5, 6, and 7(a) on pages 8 and 9 of the Application. Robinson asserts that the handwriting on page 8 of the Application is that of Moore's secretary, who was not present when Moore and Robinson met to discuss the Application. Robinson testified that she did not see and was not provided with a copy of page 8 of the Application until 2004 – years after Moore submitted the Application to MetLife. (Robinson Dep., Def.'s Exh. B at p. 49:7-14.) According to Robinson, Moore did not ask her the questions on page 8 of the Application; instead, he merely asked Robinson to obtain a doctor's statement and checkup. (Def.'s 56.1(b)(3)(C) ¶ 10, 11.) Robinson testified that she did not provide Moore with any of the information appearing on pages 8 or 9 of the Application except the doctor's statement he requested. (Def.'s Exh. B at p. 47:1-6; 53:22-24; 54:1.) Robinson further testified that she gave the doctor's statement to Moore and that she did not retain a copy. *Id.* at 48:9-13. With respect to the contents of the doctor's statement, Robinson testified only that she recalls that the doctor's statement contained the doctor's name and number and information regarding her checkup appointment. *Id.* at p. 48:4-13. During her deposition, Robinson specifically denied having provided Moore with the information "checkup, dash, in good health," which information appears in the response to question 3 on page 8 of the Application. *Id.* at p. 48:18-21.

For its part, MetLife does not dispute that Moore's secretary's handwriting appears on the Application. However, MetLife asserts that Moore and his secretary filled out the Application based upon Robinson's answers to the questions on the Application. MetLife points out that Moore

5

testified at his deposition that he asked Robinson the questions in the Application and recorded her responses thereto. (Pltf.'s Response ¶ 12.)

MetLife also concedes that Moore asked Robinson to obtain a doctor's statement. With respect to the doctor's statement, MetLife asserts that "Robinson affirmatifely furnished Mr. Moore with a purported 'doctor's statement,' stating that, as of 1995, she was in good health." (MetLife Reply Mem. at p. 6.) But MetLife has not produced the statement itself nor any other evidence to support its assertion that the doctor's statement claimed that Robinson was in good health. Moreover, Moore testified at his deposition that Robinson did not give him a doctor's statement. Moore testified that asking for a doctor's statement is part of MetLife's application process but that the applicant "wouldn't give it to me." (Def.'s Exh. C at p. 22:1-12.) The applicant "would give me [the doctor's] name . . . [a]nd then the company would send out inspectors to verify the information." (*Id.* at p. 22:16-22.) There is no evidence in the record that MetLife attempted to verify the information in the doctor's statement upon receiving it from Robinson.[2]

In December 2003, Robinson submitted a disability claim to MetLife, claiming that she was unable to work because of headaches, joint pain, and weakness. (Pltf.'s 56.1 ¶ 34). MetLife approved Robinson's claim and began distributing disability payments that eventually totaled

---

[2]Together with its response to Robinson's Rule 56.1(b)(3)(C) statement, MetLife included a one-paragraph statement entitled, "MetLife's Additional Facts." Such a statement is not contemplated by Local Rule 56.1, nor did MetLife have leave of this Court to include that statement in its response. Nevertheless, the Court has considered MetLife's "Additional Facts" in deciding the instant Motion for Summary Judgment. MetLife's single paragraph of additional facts states that, as of August 11, 2004 – 8 years after Robinson completed the Application: (1) International Claims Specialists ("ICS") could not find a listing for Dr. May; (2) ICS could not obtain records from Dr. May; and (3) that Dr. May is "not listed as a physician in the State of Illinois at this time." (Pltf.'s Response, Additional Facts ¶ 1 and Exh. A thereto.) The documents supporting MetLife's additional facts do not suggest that Dr. May was not listed as a physician in Illinois at the time Robinson was applying for the Policy in 1996. Nor do the documents supporting MetLife's additional facts offer any explanation of the efforts – if any – that ICS made to locate Dr. May and whether or not those efforts involved searching for him outside of Illinois.

$27,000. *Id.* at ¶ 37. At some point after it began distributing disability payments, MetLife received a copy of Robinson's medical records that documented treatment for an autoimmune disease prior to her application for insurance. On January 19, 2005, nearly nine years after issuing the Policy, MetLife notified Robinson that it had determined to rescind the Policy based on Robinson's failure to disclose, on the Application and the Amendment, her history of an autoimmune disease. *Id.* at ¶ 39. At that time, MetLife tendered a check to Robinson in the amount of $15,497.44, representing the premiums Robinson had paid under the Policy, with interest. *Id.*

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, courts may not make credibility determinations or weigh the evidence. *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). Instead, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See*

*Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). Disputes over material facts, those that might affect the outcome of a case, will preclude summary judgment. *Anderson*, 477 U.S. at 248. Summary judgment will not be awarded when, drawing all justifiable inferences in favor of the nonmoving party, the evidence indicates that there is a genuine issue as to a material fact. *Id.* at 255. The Seventh Circuit has held that a plaintiff may demonstrate the existence of a genuine issue of material fact and defeat summary judgment with his or her own deposition. *Paz*, 464 F.3d at 664 (citing *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)).

## DISCUSSION

### I. Misrepresentations with the Intent to Deceive.

"Illinois law permits an insurer to rescind an insurance policy if the insured's application for coverage contains a misrepresentation that was made with intent to deceive or that is material." *TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 635 (7th Cir. 2003) (citing 215 ILCS 5/154).[3] Once a life or disability insurance policy has been in force for more than two years, only misrepresentations made with the intent to deceive can void the policy. 215 ILCS 5/357.3; *see also* Pltf.'s Exh. A, Policy at p. 11 ("After this policy has been in force during your lifetime for 2 years . . . misstatements, except for fraudulent misstatements, made by you on the application for this policy, cannot be used to void this policy or deny a claim for loss incurred for a disability that begins

---

[3]The Court decides this case under Illinois law because the parties agree that Illinois law governs. *See TIG Ins. Co.*, 334 F.3d at 635 (citing *In re Stoecker*, 5 F.3d 1022, 1029 (7th Cir. 1993)).

8

more than 2 years after the issue date."). With respect to a policy, like the one in this case, issued pursuant to an application in which the applicant represents that the application is "true and complete to the best of [the applicant's] knowledge and belief," the inquiry is not whether the facts asserted were true but rather, on the basis of what the applicant knew, whether the applicant believed them to be true. *Pekin Ins. Co. v. Adams*, 343 Ill. App. 3d 272, 276 (Ill. App. Ct. 2003) (citing *Golden Rule Ins. Co. v. Schwartz*, 23 Ill.2d 456, 466 (2003)). With respect to the applicant's knowledge and belief:

> What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based. In such event, a court may properly find a statement false as a matter of law, however sincerely it may be believed. To conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self-deception-persons who having witnessed the Apollo landings, still believe the moon is made of cheese.

*Golden Rule*, 23 Ill.2d at 467 (quoting *Skinner v. Aetna Life & Casualty*, 804 F.2d 148, 151 (D.C. Cir. 1986)). This is a lesser standard than is prescribed in 215 ILCS 5/154, under which a misrepresentation, even if innocently made, may be grounds for voiding a policy if the misrepresentation materially affected the insurer's risk. *See Golden Rule*, 23 Ill.2d at 466.

In this case, the Policy had been in place for more than two years before MetLife notified Robinson of its decision to rescind. As such, MetLife may only rescind the Policy on the basis of misrepresentations in the Application if those misrepresentations were made with the intent to deceive. At the outset, the Court finds that the Application does contain misrepresentations. In spite of the fact that Robinson was treated by Dr. Hirsen at MacNeal Hospital at least 8 times in 1994 and 1995 for various symptoms including severe headaches, chest pain, and joint pain, the Application indicates responses of "no" to the questions: (1) have you ever received treatment for chest pain; (2)

have you ever received treatment for arthritis or disorder of the joints; and (3) have you ever gone to the hospital for examination or treatment not revealed in previous questions. Furthermore, although Robinson had seen at least three physicians in the 5 years prior to the date she signed it, the Application indicates only one name, Conrad May, M.D., in response to the question, "[i]n past 5 years, has any physician, counselor, chiropractor, practitioner, or health facility examined, advised or treated you? If Yes, give details . . . for each instance."

What the Court cannot decide at this stage is whether Robinson herself is responsible for the misrepresentations in the Application. MetLife notes that in "situations involving suppression of an obviously known and apparently material medical condition or treatment, courts have had no difficulty finding . . . intent to deceive." *Apolskis v. Concord Life Ins. Co.*, 445 F.2d 31, 35 (7th Cir. 1971) (citations omitted). But in this case, there is a fact dispute regarding who is responsible for the misrepresentations in the Application. Robinson testified that she never saw the questions on page 8 of the Application, that Moore never asked her those questions, and that she did not provide Moore with the information that made its way into pages 8 and 9 of the Application. Moore testified that Robinson supplied all the information that made its way into the Application. Because the Court cannot determine whether Robinson made any misrepresentations with the intent to deceive without resolving the fact dispute regarding whether Robinson is responsible for the misrepresentations in the first instance, summary judgment in MetLife's favor is inappropriate on this record.

**II.    Estoppel.**

"From an early date, Illinois courts have held that if an insurance agent fills out an application for an applicant, and without any collusion between the agent and applicant, inserts a false answer into the application, a provision that the applicant has read the application and verified the answers

before signing it will not save the insurer from being estopped from asserting the false answer as a defense." *Pekin Ins. Co.*, 343 Ill. App. 3d at 278 (citing *Royal Neighbors of America v. Boman*, 177 Ill. 27, 32 (1898)). However, "[if] the applicant has acted in bad faith, either on his own or in collusion with the insurer's agent, knowledge of the agent will not be imputed to the insurer." *Id.* (citing *Marionjoy Rehabilitation Hosp. v. Lo*, 180 Ill. App. 3d 49, 53 (Ill. App. Ct. 1989)).

In this case, Robinson argues that MetLife should be estopped from rescinding the Policy based upon misrepresentations in the Application because Moore filled out the application and inserted false answers on his own, without any collusion from Robinson. Robinson points to her testimony that she did not complete that portion of the Application that MetLife contends contains misrepresentations. Robinson further testified that Moore and his secretary were responsible for filling out that portion of the Application that MetLife contends contains misrepresentations and that Moore did not read to her any of the questions that MetLife contends she answered falsely. Robinson testified that she did not even receive a copy of that portion of the Application until long after Moore submitted the Application to MetLife.

MetLife offers a different story – that Moore completed the Application only with information that he received directly from Robinson after reading to Robinson each of the questions on the Application. Citing *Marionjoy*, MetLife also argues that Robinson manifested her bad faith when she signed the Amendment and thereby rendered the doctrine of estoppel inapplicable. In *Marionjoy*, the court declined to apply the doctrine of estoppel even though the application for insurance was prepared solely by the insurance agent because, among other reasons, the insured subsequently signed a statement confirming the accuracy of the misstatements. 180 Ill. App. 3d at 53. MetLife argues that, just like the insured in *Marionjoy*, Robinson demonstrated her bad faith

when she signed the Amendment, which affirmed the truthfulness of the medical disclosures in the Application.

The Court finds *Marionjoy* to be distinguishable from this case. First, the *Marionjoy* court observed that "whereas the average applicant may be under the impression that the agent better knows what information the insurer desires . . . such was not the fact in [that case]" because the defendants "knew the severity of their son's condition and had, on several other occasions, been turned down for insurance." 180 Ill. App. 3d at 53. In this case, while there is evidence that Robinson knew the details of her own medical history, there is no evidence that she had previously been turned down for insurance – that is to say, there is no evidence that Robinson knew that her medical history might result in a denial of her application for insurance. More importantly, when the defendants in *Marionjoy* confirmed the accuracy of the application, they did so after having received a letter from the insurer – independent of the insurer's agent – requesting that they look over their application to make sure the information it contained was correct. In this case, the Amendment did not direct Robinson to review the Application before stating that "[t]here are no facts or circumstances which would require a change in the answers in the application, except as shown above." (Pltf.'s 56.1 ¶ 11.) Moreover, Robinson has testified that she did not see or receive a copy of the allegedly misleading answers in the Application until 2004 – years after she signed the Amendment in August of 1996. As such, a jury could find that Robinson believed that – at the time she signed the Amendment – there were no facts or circumstances that would have required a change in the answers in the Application. The parties' disputes with respect to who completed the Application and who was the source of the information contained therein prevents the Court from determining whether the doctrine of estoppel is applicable at this stage.

## CONCLUSION

For the reasons stated in this Opinion, MetLife's Motion for Summary Judgment is denied.

The Court schedules this case for trial to begin on October 9, 2007 at 9:15 A.M.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: August 27, 2007